### BLOOMER v. DAU.

1. MORTGAGES—AGENT FOR COLLECTION.
    The fact that a note and mortgage are made payable at a certain bank does not constitute the bank an agent to collect the same.

2. SAME—PAYMENT—POSSESSION OF PAPERS—PAYOR'S RISK.
    A mortgagor who pays his mortgage to a banker who has been the mortgagee's general agent, knowing that the banker no longer has the note and mortgage in his possession, but relying, without inquiry as to the continuance of the agency, upon the banker's statement that he will secure the proper discharge, does so at his own risk.

3. SAME—REVOCATION OF AGENCY—ESTOPPEL.
    Where a mortgagee withdrew the mortgage and note from the possession of a bank which had acted as his general agent for collection, and notified the mortgagor of the termination of the agency by a letter which, owing to the latter's having

changed his address, did not reach him before the mortgage fell due and was paid by him to the bank, which failed without accounting for the proceeds, and before the mortgagee knew of the payment, the mortgagee was not estopped to deny the bank's authority to receive the money by his mere delay in bringing suit to foreclose the mortgage.

MOORE, J., dissenting.

Appeal from Kent; Grove, J. Submitted November 14, 1899. Decided December 30, 1899.

Bill by Reuben Bloomer against Magnus Dau, Mary C. Dau, and Jacob Mann to foreclose a mortgage. From a decree dismissing the bill, complainant appeals. Reversed.

Bill to foreclose a mortgage for $375, dated December 4, 1888, due December 4, 1893, given to one Coles A. Bloomer, the assignor of complainant. Coles A. Bloomer and complainant were brothers, and had been in partnership. Upon the dissolution of the partnership and the division of the property, the note and mortgage, with other securities, were assigned to complainant. One Cheney had a bank at Sparta. Bloomer Bros. did their banking business at his bank. The note and mortgage in this case, together with others, were left there for collection of both interest and principal. On the dissolution of the partnership, complainant left his securities there, without any further instructions to Cheney, who continued to collect interest and principal. When the moneys were collected, they were entered upon the bank books to the credit of the firm, and afterwards of complainant, who checked them out as desired. It was customary for Cheney to receive the principal and interest upon these securities, and then notify complainant (but he did not always do it), who would execute the necessary discharges either at Sparta or Grand Rapids. No instructions were given Cheney by complainant at any time in reference to his notes and mortgages. About the 1st of November, 1893,

complainant withdrew from Cheney's bank all his notes and mortgages, and took them to Grand Rapids, where he resided. He then notified Mr. Cheney, and wrote letters to his debtors, that he would thereafter attend to his own business, and to pay their indebtedness to him at Grand Rapids. Complainant was told by his brother that Mr. Dau's business address was Sparta; and that at one* time was his post-office address, but was not when the letter mentioned below was sent. Complainant, on November 6, 1893, addressed a letter to Mr. Dau, notifying him that he had his office in Grand Rapids, and, when he wished to pay on his note and mortgage, to call on him under the Fourth National Bank in Grand Rapids. Mr. Dau's address at that time was at Gooding. The letter was duly advertised at Sparta; was forwarded to the dead-letter office at Washington; was returned to complainant from the dead-letter office by letter dated January 17, 1894. Upon receiving this letter he saw Mr. Dau, who told him that he had paid the note and mortgage, when due, to Mr. Cheney. Meanwhile Cheney had failed, and had not notified complainant of the payment of the mortgage. Cheney entered the amount to complainant's credit upon the bank books. Dau obtained the money from defendant Mann, giving him a mortgage upon the same land as security. Dau and Mann met by agreement at Cheney's bank to consummate the transaction. The amount due exceeded $350 borrowed of Mann. Dau was to pay the excess, which he did before Mann arrived. Then Mann and Dau went together into the bank, where Mann paid to Cheney the $350. Neither Dau nor Mann asked where the note and mortgage were, or for their surrender. Neither did either of them ask Cheney if he still had authority to collect the money. Dau said nothing about the note and mortgage. All that was said about them appears in the following testimony of Mr. Mann:

"I simply paid the money over to Cheney, the $350, after we got Cheney to read my mortgage; and he did not have the Bloomer mortgage there, and I said, 'How

will it be about that Bloomer mortgage?' Cheney says, 'That is all right; I will see that it is taken off from the records.'"

Neither Dau nor Mann afterwards took any steps to obtain possession of the note and mortgage or a discharge. The mortgage and note were made payable at Cheney's bank. Mr. Dau had regularly paid his interest there. Mr. Cheney gave the following receipt: "Received of Magnus Dau, per J. Mann, three hundred fifty dollars, for balance of mortgage held by Reuben Bloomer against him." About four years after this transaction, complainant commenced the foreclosure of this mortgage. Defendants answered, averring payment, and prayed for a discharge of the mortgage. Decree was entered dismissing complainant's bill, and granting relief to the defendants.

*Wanty & Knappen*, for complainant.

*Wolcott & Ward*, for defendants.

GRANT, C. J. (*after stating the facts*). Complainant and defendants acted in entire good faith. Upon whom of the innocent parties shall the loss fall? We think the evidence justifies the conclusion that Mr. Cheney was the general agent of complainant and his assignor for the collection of the notes, mortgages, and other securities which had been intrusted to him for collection, including the note and mortgage in dispute, up to the time the agency was revoked. The notes and mortgages were placed in the hands of Mr. Cheney to be surrendered when payment was made. But this authority was expressly revoked, and all the notes and mortgages taken away from the possession of Mr. Cheney. His agency was thereby canceled, and he had no authority whatever to receive payments. Complainant performed his legal duty in notifying his debtors who had previously done business with Cheney in reliance upon that authority. Had the letter to Mr. Dau been directed to his then post-office address and

been received by him, complainant would have done all the law required to protect himself and to notify Mr. Dau of the termination of Cheney's agency.

When the debtor pays his debt, he is entitled to a surrender of the written evidence of that debt. Creditors usually place the bonds, notes, and mortgages they desire to have paid into the hands of their agent whom they authorize to collect. The absence of such papers is usually sufficient to place the debtor upon inquiry as to the agent's authority. A general agency continues until in some way parties have been notified of its termination, or have sufficient facts in their possession to put them upon inquiry. Banks are collection agencies, and the courts will take judicial notice of the fact that notes and other evidences of debt accompany the agency, and are placed in their hands, to be surrendered when the debt is paid. It must be presumed, therefore, that defendants knew that this was the customary method of doing business, and that this bank would, in the due course of business, if its agency continued, have the note and mortgage in its hands for surrender. There is another reason why they should be in the agent's hands, namely, for a correct computation of the amount due. Where one withdraws from his agent the instruments evidencing debts, there is an implied revocation of the authority of the agent. Story, Ag. § 475. Defendants knew that the bank did not have the note and mortgage. They chose to rely upon Mr. Cheney's word that he would procure the discharge from the complainant. We must assume that Cheney would have told the truth if defendants had asked about his agency, and, if so, an inquiry would have disclosed the fact that he was not authorized to receive the money, and that, if they chose to leave it there, the bank would become their agent, and not complainant's. The fact that the note and mortgage were made payable at Cheney's bank does not establish the agency. *Trowbridge* v. *Ross*, 105 Mich. 600, and authorities cited; *Adams* v. *Improvement Co.*, 44 N. J. Law, 638 (43 Am. Rep. 406).

We said in *Joy* v. *Vance*, 104 Mich. 97:

"He [the mortgagee] had a right to suppose that the mortgagor would not pay notes or mortgage without receiving them, and by keeping them in his own hands he interposed the only practical obstacle to the perpetration of a fraud by the mortgage company."

If that is sound law, why has not the mortgagee interposed this same practical obstacle by withdrawing the note and mortgage from his agent and expressly canceling his authority? If the bank had had the note and mortgage to deliver, defendants' contention would be sound, even though complainant had expressly terminated the agency. We are of the opinion that the defendants had no right to assume that the agency continued, in the presence of knowledge that the bank did not have the papers, and that they dealt with the bank-at their own risk.

We find no room for the application of the doctrine of estoppel. The bank had failed before complainant had any notice or knowledge of the payment. He promptly notified Mr. Dau of the letter written him, and that Cheney had no authority to receive the money. His silence after that, and his failure to commence foreclosure, do not constitute an estoppel. Complainant's delay in bringing suit would no more estop him than would Dau's failure to institute a suit to procure a discharge of the mortgage estop him from claiming payment.

The decree must be reversed, and decree entered for the complainant.

MONTGOMERY, HOOKER, and LONG, JJ., concurred with GRANT, C. J.

MOORE, J. (*dissenting*). I do not reach the same conclusion as Justice GRANT. I agree with him that Mr. Cheney was the general agent of the complainant for the collection of this and other notes and mortgages. The record also discloses that Mr. Dau knew of that fact, for he had paid him interest on the mortgage before he paid the principal. The note was payable at the bank of Mr.

Cheney. The principal of the mortgage and the balance of the interest were paid to Mr. Cheney the 5th day of December. It is not disputed that Mr. Dau had not received the letter Mr. Bloomer sent him at this time. The fact that Mr. Bloomer deemed it necessary to send such a letter indicated that he understood Mr. Dau knew Mr. Cheney had authority to receive the payment. When the money was received by Mr. Cheney it was placed to the credit of Mr. Bloomer, just as other sums of money paid on mortgages had been done. Mr. Bloomer testified that the letter came back from the dead-letter office having the Washington postmark, "Jan'y 17." On the direct examination he testified:

"I have had talk with Dau concerning his not getting this letter, in my office about a year ago. I asked him why he did not get the letter. I said, 'You used to get your mail there.' He said he did used to get it there in 1888. He said now he got his letters at Gooding. Before this conversation I had seen Dau in regard to his having paid money to Cheney, at his farm in January, 1894, about the time Cheney failed. I drove up to his place and asked him in regard to the note and mortgage. I asked him why he paid the note there. I said I notified him by letter, and he said he did not get the letter. I said, 'Did you get your note?' He said, 'No; Am. was going to get that.' Said he was going to get it discharged. He said Am. was going to get it discharged, meaning the witness Cheney. He says, 'You take that off the books.'"

On the cross-examination he testified:

"I think I went to see Dau before I got that letter back. I cannot tell you now whether I went to see Dau. I found that he had paid the amount of the mortgage to Cheney. I do not know whether, when I found out from Dau that he had paid the money to Cheney, that the latter was still doing business at the bank. I went there as soon as I heard it was paid. Mr. Cheney was there. I talked the matter over with him. I asked him for the money that was deposited to my credit. He said he hadn't got any. He did not promise that he would get it for me soon. I asked him if he had got the money,—what credit it was. It strikes me it was the Dau mortgage. 'Well,'

I says, 'have you got the money?' He said, 'No.' 'Well,' I said, 'I don't want any more of this kind of business.' And that was the end of the conversation."

The testimony does not disclose that, when Mr. Dau told him of the payment, he repudiated the authority of Mr. Cheney to receive the payment, and told Mr. Dau he should hold him liable on the note and mortgage; but, on the contrary, he had an interview with Mr. Cheney at the bank, and learned the money had been placed to his credit. He did not then repudiate Mr. Cheney's act, but informed him, when he learned he did not have the money, "I don't want any more of this kind of business." The record discloses the bank continued to do business until January 30th, and for nearly four years Mr. Bloomer remained silent. It was not until the January before the commencement of this suit, when Dau asked him to discharge the mortgage, that he repudiated the act of Cheney, and said he was going to see whether Dau had the right to pay the money to Cheney. The case comes directly within *Wilson* v. *La Tour*, 108 Mich. 547; *Ziegan* v. *Stricker*, 110 Mich. 282.

I think the circuit judge made a proper disposition of the case, and the decree should be affirmed.