605 A.2d 83

The TRAVELERS INDEMNITY COMPANY, Charter Oak Fire
Insurance Company, and Phoenix Insurance Company

v.

Bernard W. MERLING.

No. 30, Sept. Term, 1990.

Court of Appeals of Maryland.

April 24, 1992.

Motion for Reconsideration Denied June 5, 1992.

**330**

Lee H. Ogburn, argued and on brief (Kathleen A. Birrane, Kramon & Graham, P.A., on brief), Baltimore, for petitioners/cross respondents.

Thomas Waxter, Jr., Semmes, Bowen & Semmes, Baltimore, for Aetna Cas. & Surety Co. et al., amicus curiae.

David M. Buffington, H. Thomas Howell, and Janet M. Truhe, Semmes, Bowen & Semmes, Baltimore, for Maryland Cas. Co., amicus curiae.

Thomas J. Schetelich and Samuel C.P. Baldwin, argued and on brief (Thieblot, Ryan, Martin & Ferguson, on brief), Baltimore, for respondent/cross petitioner.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland (retired) Specially Assigned.

ELDRIDGE, Judge.

This case concerns the rights of an independent insurance agent, whose agency was lawfully terminated by the insurer, with respect to insurance policies which the agent had originally produced but which were renewed by the insurer after the termination of the agency.

The plaintiff Bernard W. Merling is an independent insurance agent, and, as such he may place his clients with one of several insurance companies, depending upon the best interests of those clients. Merling had entered into an agency agreement with the defendant insurance companies, who are the Travelers Indemnity Company, the Charter Oak Fire Insurance Company, and the Phoenix Insurance Com-

pany (hereinafter collectively referred to as "Travelers").[1] The agency agreement authorized Merling to solicit, bind and issue Travelers' insurance policies for certain types of risks. In exchange for selling Travelers' insurance policies, Merling was entitled to receive as commissions a percentage of the premiums paid on all policies originated or renewed through Merling. The agency agreement also provided for termination of the agency relationship upon 120 days notice by either party.

On September 19, 1986, Travelers notified Merling by letter that he was to be terminated effective January 30, 1987. A subsequent letter extended this date to February 20, 1987. The reason for his termination, as stated in the original letter, was Merling's inability to produce any quantity of certain types of business. Although Merling complained to Maryland's Insurance Commissioner, the Commissioner concluded that his termination was lawful under the Insurance Code, Maryland Code (1957, 1991 Repl.Vol.), Art. 48A, § 234B. Merling did not seek judicial review of the Commissioner's decision pursuant to Art. 48A, §§ 40 and 234C. Merling has not, and indeed could not, collaterally challenge that administrative determination by the Insurance Commissioner in the present action.

Travelers' termination letter advised Merling that, "in line with contract provisions [of the agency agreement] we will offer to renew all existing business which meets our current underwriting standards for one year after the effective date of this termination." Travelers, in accordance with that agreement, paid Merling the renewal commissions for the one year from February 20, 1987, to February 20, 1988. During that one year period, Merling was able to place some of his clients with other insurance companies, either directly or through another agent. Nevertheless,

---

1. The Charter Oak Fire Insurance Co. and the Phoenix Insurance Co. are subsidiaries of the Travelers Indemnity Company.

many of Merling's clients chose to remain with Travelers.[2] Merling wrote a letter to these clients stating that Travelers "has discontinued its business relationship with" Merling, that Merling had originally placed the clients with Travelers as it was in their best interests, and that it was in their best interests to stay with Travelers.

After February 20, 1988, Travelers notified Merling's clients directly that the business relationship between Travelers and Merling had ended. The letter also stated that, as required by law, their policies would continue to be renewed. The letter, however, informed the insureds that Merling was "in the best position to handle your insurance needs, including placing your insurance with another company." The letter further stated that "[w]e urge you to contact your insurance agent for counseling ... or if you wish to continue insuring with The Travelers, a bill will be sent to you shortly."

Those insureds deciding to remain with Travelers had their policies recoded to a house account, with no agent listed on the policy. The policies were renewed directly through Travelers. No renewal commissions on these policies were paid to Merling or to any other agent after February 20, 1988.

On December 13, 1988, Merling instituted in the Circuit Court for Baltimore City the present action against Travelers, alleging that Travelers had committed various torts with regard to Merling's property rights and contract rights. The complaint initially set forth in detail the facts as summarized above. Thereafter, count one of the complaint, labeled "Conversion," asserted that the defendants had converted Merling's "personal property by appropriating to their own exclusive use and ownership the expira-

---

**2.** According to Merling, some of his clients had no choice but to remain with Travelers as the underwriting standards for new business are much higher than for renewal business. Thus, no new carrier would insure these clients as new business, while Travelers was obligated by statute to renew their policies.

tions entrusted to them by Plaintiff." [3]  Count three, labeled "Intentional Interference With Property Rights," asserted that Merling "was the sole and exclusive owner of his work product, called 'expirations,'" and that the "[d]efendants interfered with and deprived Plaintiff of his property right to his expirations."  The substance of both count one and count three was the same, namely that Merling's expirations were "converted" or "interfered with" by Travelers' action in sending renewal policies and premium invoices to Merling's former clients in such a manner that the business was not renewed through Merling and was renewed as house accounts. [4]

The second count of Merling's complaint asserted that Travelers had intentionally interfered with the contractual or economic relations between Merling and his clients, and the fourth count alleged that Travelers had violated the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO").  Merling sought both compensatory and punitive damages.

Travelers filed a motion to dismiss, and Merling filed a motion for summary judgment with regard to liability.  The circuit court granted Merling's motion for summary judgment on the first three counts, concluding that Merling was "entitled to his commissions ad infinitum ... [a]s long as that customer continues the business with that company...."  The circuit court conditioned Merling's entitlement to damages upon Merling's continued servicing of those policies.  The circuit court granted Travelers' motion to dismiss with respect to the RICO count and the request for punitive damages.

---

**3.** "Expirations" refers to an agent's work product or the information collected by the agent with regard to his clients.

**4.** The reason for having both counts one and three in the complaint might have been a concern over the scope of the tort of conversion, or trover as it was formerly known, at common law. *See* 1 Poe, *Pleading and Practice*, §§ 206–219 (5th ed. 1925); Prosser, *Laws of Torts*, § 15 (4th ed. 1971).

A separate trial was then held before a different judge on Merling's damages. At the conclusion of the trial on damages, the circuit court entered judgment against Travelers in the amount of $59,892.02 plus interest. Both parties appealed to the Court of Special Appeals, and, prior to oral argument in the Court of Special Appeals, both sides petitioned this Court for a writ of certiorari. We granted both petitions.

## I.

In the circuit court and in this Court, Merling argued that common law principles gave him exclusive ownership of his expirations. He contended that Travelers' use of those expirations to contact his insureds tortiously violated his property rights and amounted to a conversion of his property. In this Court, Merling insists that "[t]he claims below were not predicated upon a right to renewal commissions based on contract. Rather, the claims below were in tort, for the conversion of an independent agent's expirations, for intentional interference with his contractual relations with his clients (the insureds), and for the intentional interference with his property rights."[5] (Merling's brief, pp. 1–2). Consequently, as Merling's counsel conceded at oral argument, the case primarily turns on the nature of Merling's expirations as a property right.

---

5. A right to renewal commissions must be granted by the language of the agency contract. In the absence of a provision in the agreement providing continued payment of renewal commissions after termination, an agent has no right to such commissions. *Niroo v. Niroo,* 313 Md. 226, 234–235, 545 A.2d 35, 39 (1988); *Travelers' Ins. Co. v. Hermann,* 154 Md. 171, 185, 140 A. 64, 69 (1928); *Rosenberg v. Lipman,* 143 Md. 512, 517, 122 A. 781, 782 (1923); *Scott v. Travelers' Ins. Co.,* 103 Md. 69, 77, 63 A. 377, 380 (1906); *Pruitt v. Southern Underwriters, Inc.,* 83 So.2d 115, 116 (Fla.1955); *Anderson v. Farm Bur. Mut. Ins. Co.,* 112 Idaho 461, 469, 732 P.2d 699, 707 (1987); *Becker v. Nahm & Turner, Inc.,* 435 S.W.2d 750, 752 (Ky.1969). *See also* 16B Appleman, *Insurance Law and Practice,* § 9003 (1981); *Couch on Insurance,* 2d, § 26A: 232 (1984); W.R. Habeeb, *Insurance Agent's Right to Commissions on Renewal Premiums,* 36 A.L.R.3d 958, 970 (1971).

■ The term "expirations" has a definite meaning and, as stated in *V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc.*, 199 F.2d 244, 246 (4th Cir.1952), *cert. denied*, 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342 (1953), includes

> "the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance premiums, property covered and terms of insurance."

*See also, e.g., Fred Miller Co. v. Empire Fire & Marine Insurance Co.*, 503 F.2d 751, 752 n. 1 (8th Cir.1974); *Woodruff v. Auto Owners Ins. Co.*, 300 Mich. 54, 59–60, 1 N.W.2d 450, 453 (1942); *Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co.*, 111 Vt. 502, 510, 18 A.2d 164, 168 (1941); *Shrewsbery v. National Grange Mut. Ins.*, 183 W.Va. 322, 395 S.E.2d 745, 749 (1990); *Blume v. Curson*, 447 S.W.2d 727, 730 (Tex.App.1969); *Garrett v. American Family Mutual Insurance Co.*, 520 S.W.2d 102, 108 n. 1 (Mo.App. 1974); *Matter of Estate of Corning*, 108 A.D.2d 96, 99, 488 N.Y.S.2d 477, 480 (1985); *Calley v. United States*, 220 F.Supp. 111, 113–114 (S.D.W.Va.1963).

This bundle of information is recognized in the insurance field as a "valuable asset in the nature of good will." *V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc., supra*, 199 F.2d at 246. *See also Fred Miller Co. v. Empire Fire & Marine Insurance Co., supra*, 503 F.2d at 752 n. 1; *Shrewsbery v. National Grange Mut. Ins., supra*, 395 S.E.2d at 750; *Calley v. United States, supra*, 220 F.Supp. at 114. It provides the insurance agency with the opportunity to contact the insured prior to termination of a policy and either renew the policy or secure another policy with a different insurance company. The custom and usage in the insurance trade recognizes this asset as a property right belonging to the agent. *See Fred Miller Co. v. Empire Fire & Marine Insurance Co., supra*, 503 F.2d at 754–755; *Spier v. Home Insurance Company*, 404 F.2d 896, 898 (7th Cir.1968); *V.L. Phillips & Co. v. Pennsylvania Thresher-*

*men, Etc., supra,* 199 F.2d at 246; *Woodruff v. Auto Owners Ins. Co., supra,* 300 Mich. at 59–60, 1 N.W.2d at 453; *Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co., supra,* 111 Vt. at 510, 18 A.2d at 168; *Shrewsbery v. National Grange Mut. Ins., supra,* 395 S.E.2d at 750; *Calley v. United States, supra,* 220 F.Supp. at 114; *Hedlund v. Farmers Mutual Automobile Insurance Company,* 139 F.Supp. 535, 537 (D.Minn.1956). The cases refer to this custom and usage in the insurance trade as the "American Agency System." *See, e.g., Fred Miller Co. v. Empire Fire & Marine Insurance Co., supra,* 503 F.2d at 754–755; *Spier v. Home Insurance Company, supra,* 404 F.2d at 898; *Woodruff v. Auto Owners Ins. Co., supra,* 300 Mich. at 59–60, 1 N.W.2d at 453; *Hedlund v. Farmers Mutual Automobile Insurance Company, supra,* 139 F.Supp. at 537.

█ Under American common law principles, *i.e.,* under the American Agency System, if an insurance company terminated an agent, the company was prohibited from interfering with the agent's property right in the expirations. This meant that the company could not use the expirations to directly solicit the insureds or to refer them to other agents who represented the company. *V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc., supra,* 199 F.2d at 248 ("The [company] had no right to solicit directly from the insured nor could it do so indirectly by appointing plaintiffs' former agents and thereby acquire through them the expirations and use them to the prejudice of plaintiffs"); *Woodruff v. Auto Owners Ins. Co., supra,* 300 Mich. at 60, 1 N.W.2d at 453 ("the so-called clientele . . . of an insurance agent may be preserved to him as far as possible upon the termination of his agency"). *See also Calley v. United States, supra,* 220 F.Supp. at 114. The result was that, upon termination of the agent, a majority of the policies which originated from that agent were not renewed.[6]

_____

**6.** This prohibition against the insurance companies' use of the agent's expirations to directly solicit the insureds did not prohibit the in-

■ Even though the American Agency System gave the agent a property right in his expirations, several courts concluded that the insurance company was permitted, if not required, to contact the insureds directly after an agent's termination. *See Spier v. Home Insurance Company, supra,* 404 F.2d at 899 (it was the company's duty to inform its insureds of the termination, and the American Agency System did not change that duty); *Hedlund v. Farmers Mutual Automobile Insurance Co., supra,* 139 F.Supp. at 537 (letter to the insureds was sent without malice and had no ulterior purpose other than to provide the insureds with important information); *Woodruff v. Auto Owners Ins. Co., supra,* 300 Mich. at 60, 1 N.W.2d at 453 (American Agency System "does not cut off all right of the insurer to contact persons to whom its policies have been issued through the discontinued agency").

The above-cited cases indicate that even under common law principles, the agent's right to his expirations was not absolute. Moreover, Maryland, like many other states, has legislatively changed the common law American Agency System.

By Ch. 417 of the Acts of 1970, the General Assembly added §§ 234A, 234B and 234C to the Insurance Code, Art. 48A. Section 234A was enacted to prohibit insurance companies from engaging in numerous underwriting practices deemed arbitrary or discriminatory, including the practice of what is called "redlining," whereby insurers would refuse to renew or write policies based on the geographic area in which the insureds or applicants lived. Section 234A, *inter alia,* required insurers to renew existing policies unless the insurers could demonstrate certain economic or business reasons for the refusal to renew. Section 234B

---

sureds from seeking out the company on their own in order to renew their policies. *See V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc.,* 199 F.2d 244, 247–248 (4th Cir.1952), *cert. denied,* 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342 (1953).

protected insurance agents from arbitrary or discriminatory termination by insurers. Section 234C granted to the Insurance Commissioner the power to order an insurance company either to accept the risk of an insured or the business from an agent if the Commissioner finds a violation of either § 234A or § 234B.

Sections 234A, 234B, and 234C, as originally enacted in 1970, still did not completely prevent the nonrenewal of insurance policies for reasons unrelated to legitimate underwriting considerations. Under the American Agency System, the insurance companies could not use the expirations of a terminated agent to renew the policies of insureds. Therefore, when an agent in a particular geographic area was terminated for a legitimate reason, the effect was that the insurance policies of that agent's clients were not renewed.

By Ch. 73 of the Acts of 1972, the General Assembly amended § 234B so that a compromise was reached between the agent's right to his expirations following termination and the State's interest in protecting the insureds from cancellations or nonrenewals. As amended in 1972, the statute guarantees that the policies produced by the agent will be renewed through the agent for one year following the agent's termination.[7] The statute also per-

---

7. Other states which have enacted similar mandatory renewal provisions also recognize the tension between the provision and an agent's right to his expirations. Of those states, most of them have provided the agent with at least a year's worth of renewal commissions following termination. *See* Cal.Ins.Code § 769(d) (West Cum.Supp.1992); Del.Code Ann. tit. 18 § 529 (1975, 1989 Repl.Vol.); Kan.Stat.Ann. § 40–2, 107(b) (1986); Mass.Ann.Laws ch. 175, § 163 (Law.Co-op. Cum.Supp.1991); N.M.Stat.Ann. § 59A–11–13 D (Cum.Supp.1991); N.Y.Ins.Law § 3425(j)(1)(D) (Consol.1985) (only provides the agent with 120 days); Pa.Stat.Ann. tit. 40, § 243 (Purdon Cum.Supp.1991); R.I.Gen.Laws § 27–3–45 (1989). *But see* Ariz.Rev.Stat.Ann. § 20–1631 E (1990) (agent remains agent of record even after termination and entitled to same level of compensation as long as he continues to service the policy); N.J.Stat.Ann. § 17:22–6.14a(c) (West Cum.Supp. 1991).

mits the agency agreement to set forth a longer period.[8]

Thus, the agent is given the benefit from his expirations for at least a year after termination; he is guaranteed at least a year's worth of renewal commissions. During that year the agent may, as Merling did, place his clients with other insurance companies or broker his clients through another agency. The agent may also sell his expirations outright to another agency, as they are a marketable asset.[9] At the end of that one year period, or whatever longer period might be set forth in the agency agreement, the insurance company is required by § 234B to renew the policies of those insureds who decide to stay with the company, unless there exist valid grounds for nonrenewal other than the termination of the agent. Section 234B(c) states: "No insurer shall cancel or refuse to renew the policy of the insured because of the termination of the agent's or broker's contract."

Section 234B(c), therefore, requires the insurer to use the former agent's expirations to renew the policies of those insureds choosing to remain with the insurer. The statute obviously modifies an agent's property right in his expirations. Travelers was simply complying with the mandate of

---

**8.** Maryland Code (1957, 1991 Repl.Vol.), Art. 48A, § 234B(b) provides in part as follows (emphasis added):

*   *   *   *   *   *

"(b) If an insurer intends to cancel a written agreement with an agent or broker, or intends to refuse any class of renewal business from the agent or broker, the insurer shall give the agent or broker not less than 90 days written notice. Notwithstanding any provision of the agreement to the contrary, *the insurer shall continue for not less than one year after termination of the agency agreement to renew through the agent or broker any of the policies which have not been replaced with other insurers as expirations occur.* * * *"

**9.** The terminating insurance company may even choose to purchase the expirations itself, as it may wish to eliminate the agent's involvement immediately. By purchasing the expirations prior to the end of the one year post-termination period, the company avoids paying the agent the renewal commissions for that year and prevents the agent from interfering with the policies of the current insureds.

the statute, rather than interfering with Merling's property rights or converting Merling's property.

■ Merling also points to paragraph 14 of his agency agreement with Travelers as confirming his property right in his expirations. Paragraph 14 recognizes Merling's "control of [his] expirations," provides that Travelers will not use them in a way "which shall abridge the Agent's rights," and that Travelers will not "refer or communicate this expiration information or work product to any other Agent or Broker." Merling does not argue however, that paragraph 14 grants him greater rights in his expirations than he would otherwise have, and that such contractually granted greater rights continue even after the expiration of the agency agreement. Moreover, nothing in the language of paragraph 14 would support such an argument. In addition, paragraph 13 of the agreement appears to embody the one-year post termination period guaranteed by § 234B(b) for renewals through the agent, as it provides that, after termination, all policies expiring "may, at the option of the Agent, be renewed for one additional year, at the rate of commission and upon the terms in effect at the time of termination." Paragraph 14 of the agency agreement simply recognizes the agent's common law property right in his expirations. That property right, however, has been modified by Art. 48A, § 234B.

Travelers' alleged actions in this case, being entirely in accordance with § 234B, did not constitute a conversion of or interference with Merling's property rights. The circuit court erred in granting Merling's motion for summary judgment on counts one and three of his complaint.

## II.

The circuit court also granted Merling's motion for summary judgment on the count asserting an intentional interference with the contractual or economic relations between Merling and his clients.

Merling appears to recognize that, to the extent that the contractual or economic relations among the clients, Merling, and Travelers are reflected in the insurance policies, Travelers cannot be guilty of the tort of wrongful interference with contractual or economic relations because it is a party to the insurance policies. For the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered. *See, e.g., K & K Management v. Lee,* 316 Md. 137, 154–156, 557 A.2d 965, 973–974 (1989); *Sharrow v. State Farm Mutual,* 306 Md. 754, 763, 511 A.2d 492, 497 (1986); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744, 754 (1981) ("there is no cause of action for interference with a contract when suit is brought against a party to the contract"); *Shrewsbery v. National Grange Mut. Ins., supra,* 395 S.E.2d at 748 ("no one can be liable for tortious interference with his own contract"). Merling contends, however, that "[t]he contract here interfered with is the personal services contract between the independent agent and his client, rather than the contract of indemnity issued by the insurer...." (Merling's brief, p. 22).

Assuming arguendo that there existed contracts between Merling and the insureds which were separate from the insurance policies and that Travelers interfered with those contracts by renewing the policies of the insureds as house accounts instead of through Merling, Merling still would not be entitled to recover tort damages for Travelers' interference. For one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful. *K & K Management v. Lee, supra,* 316 Md. at 155–170, 557 A.2d at 973–981; *Sharrow v. State Farm Mutual, supra,* 306 Md. at 765, 511 A.2d at 498; *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 71–74, 485 A.2d at 675; *Stannard v. McCool,* 198 Md. 609, 616, 84 A.2d 862, 866 (1951); *Sum-*

*walt Ice Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 413, 80 A. 48, 50 (1911).

For the reasons set forth in Part I of this opinion, Travelers' actions were neither wrongful nor unlawful. Therefore Travelers did not tortiously interfere with Merling's contractual or economic relations with his clients. The circuit court erroneously granted Merling's motion for summary judgment on count two of the complaint.

### III.

In his cross appeal, Merling challenges the circuit court's dismissal of the count alleging a violation of RICO, 18 U.S.C. §§ 1961–1968. Section 1962(b) provides as follows:

> "(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of any unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Section 1964(c) states:

> "(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." [10]

The Supreme Court in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 481–482, 105 S.Ct. 3275, 3277, 87 L.Ed.2d 346, 349–350 (1985), explained the term "racketeering activity" in RICO as follows:

> "RICO takes aim at 'racketeering activity,' which it defines as any act 'chargeable' under several generically

---

**10.** Although 18 U.S.C. § 1964(c) refers only to United States district courts, the Supreme Court has held that state courts have concurrent jurisdiction over civil actions brought under RICO. *Tafflin v. Levitt,* 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, including mail and wire fraud, and any 'offense' involving bankruptcy or securities fraud or drug-related activities that is 'punishable' under federal law. § 1961(1)."

Merling argues that Travelers' actions in mailing "hundreds of deceptive letters to Merling's policyholders, by which the Travelers Companies appropriated the expirations," constituted a "fraudulent appropriation to one's own use of another's property entrusted to him." (Merling's brief, p. 39). According to Merling, this conduct by Travelers amounted to "mail fraud" in violation of the federal mail fraud statute, 18 U.S.C. § 1341, and, therefore, amounted to "racketeering" in violation of RICO.

Whatever may be the scope of RICO and the federal mail fraud statute in other contexts,[11] it is obvious that the alleged actions of Travelers, upon which Merling relies, do not constitute a violation of the federal mail fraud statute. The Supreme Court in *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292, 302 (1987), quoting from *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924), pointed out with respect to the mail fraud statute that

"the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' "

The Court went on to say "that the statute reache[s] false promises and misrepresentations as to the future as well as other frauds involving money or property." *McNally v. United States, supra*, 483 U.S. at 359, 107 S.Ct. at 2881, 97 L.Ed.2d at 302.

---

**11.** With regard to RICO, *see, e.g., H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). As to the federal mail fraud statute, *see McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

As outlined in Part I of this opinion, Travelers' actions were not wrongful. Travelers did not obtain Merling's property by "trick, deceit, chicane or overreaching" or by any "false promises and misrepresentations." The insurer's letters to the insureds were truthful and accurate. Travelers' actions were entirely lawful under the Maryland Insurance Code; in fact, the actions about which Merling complains were required by the Insurance Code, Art. 48A, § 234B.

Since Merling's allegations failed to set forth any wrongful acts by Travelers, the circuit court correctly dismissed the RICO count. For the reasons previously discussed, however, the circuit erred in granting summary judgment in favor of Merling on the other counts. The court should have granted Travelers' motion to dismiss those counts.

THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IN FAVOR OF BERNARD W. MERLING IS REVERSED. THE ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY DISMISSING COUNT FOUR OF THE COMPLAINT IS AFFIRMED. THE CASE IS REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS TO DISMISS THE ENTIRE COMPLAINT. COSTS TO BE PAID BY BERNARD W. MERLING.